UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CASSANDRA GESKE, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 19-cv-05170 |
| v. | ) ) | Hon. Steven C. Seeger |
| PNY TECHNOLOGIES, INC., | ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

This case involves a weak power bank. Plaintiff Cassandra Geske bought a portable power bank at the grocery store so that she could charge her electronic devices on the go. She purchased a PowerPack 5200, manufactured by Defendant PNY Technologies. The packaging prominently declared that it offered "5200 mAh" of available power for "3x CHARGES*." She thought that the power bank would deliver "5200 mAh" of power to her cell phone.

But the power bank was not as powerful as she had expected. She had to recharge the power bank more often than she thought. She later discovered that the power bank was never capable of delivering 5200 mAh of power at all. The power bank itself consumes a significant portion of the power. So PNY charges too much for a product that charges too little.

Geske sued PNY on behalf of herself and a putative class of purchasers of PNY power banks. She claims that PNY misrepresented the power of its products. She alleges an economic injury measured by the difference in value between the product as promised and the product as delivered. She seeks an injunction, too, even though there is no reason to believe that she is going to buy another weak power bank.

PNY moved to dismiss for lack of standing, and for failure to state a claim for which relief can be granted. For the reasons explained below, the motion is granted in part and denied in part.

## Background

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

Portable electronic devices, especially cell phones, are omnipresent in modern American life. *See* Am. Cplt., at ¶ 1 (Dckt. No. 39); *see also Carpenter v. United States*, 138 S. Ct. 2206, 2211 (2018) (stating that in 2018 there were 396 million cellphone service accounts in a country of 326 million people). As any user is all too aware, electronic devices need power to function. *See* Am. Cplt., at ¶ 2. To help consumers charge their devices on the go, technology companies created portable chargers, otherwise known as power banks. *Id.* at ¶¶ 3–4.

A power bank is made up of an internal battery cell and a circuit board. *Id.* at ¶ 34. The circuit board converts the battery's power into voltage, and then transfers that power to a connected electronic device. *Id.* at ¶¶ 34–35. So energy flows from the power bank to the device, giving it a charge (and giving the user a boost).

But it takes power to send power. The power bank must use some of the power to convert and distribute power from the internal battery to the connected device. *Id.* at ¶ 36. This process can use as much as 30 to 40 percent of the battery power of the power bank. *Id.*

A power bank's capacity to charge another device is measured in milliampere-hours ("mAh"). *Id.* at ¶ 5. The unit of measurement is an ampere-hour, meaning a current of one

ampere flowing for one hour. So, as the name ("milli") suggests, an mAh is one thousandth of an ampere-hour.

A higher number means more power. A higher mAh means that the power bank can provide more energy. *Id.* And more power means that the power bank has a greater ability to charge electronic devices. *Id.*

The amount of power that a power bank can provide is important to consumers. In fact, the amount of power is "*the* material factor in making a purchasing decision, because the function of the power bank is to provide power, and more is better." *Id.* at ¶ 70 (emphasis in original); *id.* at ¶ 6 ("The main point of buying a power bank is to have the ability to get more power."). Consumers buy power banks for power, not looks. *Id.* at ¶ 6. They prefer power banks with higher mAh, and pay more for them. *Id.* at ¶ 7. More power is more valuable. The higher the power, the higher the price.

Defendant PNY Technologies, Inc. ("PNY") is a global technology company and a major manufacturer of power banks. *Id.* at ¶¶ 3, 8, 21–22. The company makes power banks with a range of mAh, from 1500 mAh up to 10400 mAh. *Id.* at ¶¶ 9, 23. PNY informs consumers about the amount of mAh offered by a power bank through the name of the product and the label on the packaging. *Id.* at ¶¶ 24, 30–31; *see generally* Pictures (Dckt. No. 43-2, at 2–4 of 10) (showing the packaging).

In 2018, Plaintiff Cassandra Geske purchased a PNY power bank, the PowerPack 5200. *See* Am. Cplt., at ¶¶ 13, 45 (Dckt. No. 39). She allegedly read and relied on the representation that the PowerPack 5200 could actually deliver 5200 mAh to her devices. *Id.* at ¶¶ 13, 45. In her view, the product's very name – PowerPack 5200 – said it all. *Id.* at ¶ 24.

A picture of the packaging for the PowerPack 5200 appears in the amended complaint. *Id.* at ¶ 30. The top of the packaging included the following name and description: "PNY 5200 mAh POWERPACK," with "3x CHARGES*" appearing right below. *Id.* at ¶ 30; *see also id.* at ¶ 46 ("On PNY's package, PNY said that the PowerPack 5200 had '5200 mAh.'"). The bottom of the power bank repeated that figure: "Capacity: 5200mAh." *Id.* at ¶ 32.[1]

Geske paid $12.99 for the power bank. *Id.* at ¶ 47. But at some point, she began to feel that she didn't get what she paid for. She had to recharge the power bank more often than she expected. *Id.* at ¶ 48.

But Geske didn't return the device to the store. Instead, she hired a laboratory to figure out if her $12.99 power bank underperformed. *Id.* at ¶ 40.

The lab ran tests on two PNY PowerPack 5200s (although not the actual power bank that she had purchased) and two PNY PowerPack 1800s. *Id.* at ¶¶ 40–41. The lab measured the amount of mAh delivered by the power packs. *Id.* And sure enough, the two PowerPack 5200s delivered 3399 and 3522 mAh, respectively, about a third less than 5200 mAh. *Id.* at ¶ 43. The two PowerPack 1800s underperformed, too. They delivered about 1005 and 1041 mAh, respectively, about 45 percent less than 1800 mAh. *Id.*

Geske ultimately sued PNY on behalf of herself and a putative class of buyers of PNY power banks in Illinois and other states. *See* Cplt. (Dckt. No. 1). She later filed an amended complaint that advanced claims on behalf of herself and buyers in Illinois and 20 other states (plus the District of Columbia). *See* Am. Cplt. (Dckt. No. 39)

Geske believes that her PowerPack 5200 did not pack enough punch. It did not provide as much juice as advertised. And she alleges that her problems weren't an isolated occurrence.

---

[1] Based on the filings, it is unclear whether the bottom of the power bank is visible to consumers before buying the device and opening the packaging.

Her power bank wasn't a lemon.  Instead, she believes that all power banks sold and marketed by PNY suffer from a similar deficiency.  Specifically, she claims that all PNY power banks deliver a "substantially lower" amount of mAh than PNY represents.  *Id.* at ¶ 25.

The amended complaint includes three counts.  Count I alleges a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act and comparable statutes in other states. Count II alleges breach of warranty, and Count III alleges unjust enrichment.

In Geske's view, PNY is not delivering what consumers expect.  Consumers expect that the mAh on the packaging refers to the amount that their electronic devices will *receive*, not the amount of power that a power bank has before consuming some of the power itself.  *Id.* at ¶ 38. That is, buyers read the label and expect the product to *deliver* the listed mAh.  *Id.*; *see also id.* at ¶ 5 ("[A] label that represents that a power bank has a certain mAh conveys to reasonable consumers that the power bank is capable of delivering that amount of mAh.").

In reality, the power banks aren't as powerful as consumers expect.  PNY's labels are misleading – they refer to the mAh capacity of the internal battery, not the amount of mAh that the power banks actually deliver.  *Id.* at ¶ 36.  Unwitting consumers have no idea that the power banks are consuming a big percentage of their own power.  *Id.* at ¶ 37.

According to the complaint, the overstatement is no accident.  PNY intentionally overstates the amount of power that its power banks actually provide.  *Id.* at ¶¶ 12, 32–33, 36, 39.  The company "intentionally deceives consumers by misrepresenting the amount of power its Products can transfer" to electronic devices.  *Id.* at ¶ 11.

PNY misrepresents the amount of power because the company knows that consumers pay more for more power.  *Id.* at ¶¶ 7–8, 26.  PNY "exploits consumers' preferences for power banks with higher mAh."  *Id.* at ¶ 11.  "By deceiving consumers about the Products' mAh, PNY is able

to sell more of, and charge more for, the Products than it could if they were labeled accurately." *Id.* at ¶ 26.

Geske alleges that she suffered an economic injury. That is, she paid a premium based on her belief that the 5200 mAh PowerPack would actually deliver 5200 mAh. *Id.* at ¶ 13. She suffered an injury based on the difference in value between the product as advertised and the product as delivered. *Id.* at ¶ 27. "Consumers are willing to pay more for the Products based on their belief that they are capable of delivering the promised mAh than they would pay if the Products were truthfully advertised and labelled." *Id.* If she had known that she was buying a weak power pack, she might not have bought it in the first place. *Id.* at ¶ 88.

## Legal Standard

PNY moved to dismiss Geske's complaint for lack of standing under Rule 12(b)(1), and for failure to state a claim under Rule 12(b)(6). *See generally* Def.'s Mtn. to Dismiss, at 8 (Dckt. No. 43).

Article III standing is an "essential component of Article III's case-or-controversy requirement," and therefore a "threshold jurisdictional question." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) ("The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches.").

A party can bring either a facial challenge or a factual challenge to a plaintiff's Article III standing. *See Apex Digital*, 572 F.3d at 443. A facial challenge means that the complaint does

6

not sufficiently allege that the plaintiff has standing. *Id.* A factual challenge, on the other hand, involves an argument about real-world facts, not the allegations of the complaint. That is, the complaint may be "formally sufficient," but "there is *in fact* no subject matter jurisdiction." *Id.* at 444 (citing *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003)) (emphasis in original). A facial challenge looks to the face of the pleadings, and a factual challenge looks to the facts.

A court reviews facial and factual challenges differently. A facial challenge is like an ordinary motion to dismiss. The court must "accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom in plaintiff's favor," and cannot rely on evidence outside the pleadings. *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 691 (7th Cir. 2015) (citing *Retired Chicago Police Assoc. v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996)). But in a factual challenge, a court may consider "whatever evidence has been submitted" on the issue of standing. *Apex Digital*, 572 F.3d at 444; *see also Reid L. v. Illinois State Bd. of Educ.*, 358 F.3d 511, 515 (7th Cir. 2004) (explaining that the court may "find the facts" in a factual challenge).

PNY brings a facial challenge to Geske's standing. *See* Def. Mtn. to Dismiss, at 6 (Dckt. No. 43). So the Court will "accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom in plaintiff's favor," and will not consider outside evidence. *Remijas*, 794 F.3d at 691.

In addition to standing, PNY also argues that the complaint fails to state a claim. A motion to dismiss for failure to state a claim challenges the sufficiency of the complaint itself, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, a court must accept as true all

7

well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive, a complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## Analysis

PNY's standing argument focuses on remedies. PNY argues that Geske lacks Article III standing to seek (1) damages on behalf of herself, (2) damages on behalf of a class, and (3) an injunction. *See* Def. Mtn. to Dismiss, at 7–13 (Dckt. No. 43).

In the motion to dismiss for failure to state a claim, PNY basically marches through each of the counts, and puts together an argument that the allegations of the complaint are insufficient. PNY challenges the demand for punitive damages, too.

## I. Standing

Article III vests federal courts with the power to decide "Cases" and "Controversies." U.S. Const. art. III, § 2. The doctrine of standing flows from that bedrock requirement. Standing is a "short-hand term for the right to seek judicial relief for an alleged injury." *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017). A plaintiff must suffer a real-world injury to stand in the courthouse and seek relief. *See generally* Steven L. Winter, *The Metaphor of Standing and the Problem of Self-Governance*, 40 Stan. L. Rev. 1371 (1988).

Courts use a three-prong test to determine whether a party has standing to bring a claim. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Lewis v. Casey*, 518 U.S. 343, 349 (1996). The plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the

8

challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan*, 504 U.S. at 560); *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019).

The plaintiff – as the party invoking federal jurisdiction – has the burden to demonstrate standing. *See Spokeo*, 136 S. Ct. at 1547. The plaintiff must "clearly . . . allege facts demonstrating" each of the three elements. *Warth v. Seldin*, 422 U.S. 490, 518 (1975).

Remedies are no exception. The plaintiff must establish standing for each kind of requested relief. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) (holding that even though plaintiff had standing to pursue damages, he lacked standing to pursue injunctive relief); *see also Lewis*, 518 U.S. at 358 n.6 ("[S]tanding is not dispensed in gross."); *Friends of the Earth*, 528 U.S. at 185 ("[A] plaintiff must demonstrate standing separately for each form of relief sought."). When it comes to remedies, there is no such thing as in-for-a-penny, in-for-a-pound standing.

Here, Geske seeks three kinds of relief: damages on behalf of herself, damages on behalf of a class, and an injunction. PNY challenges them all. So the Court will address her standing to seek each type of relief. *See* Am. Cplt., at 17 (Dckt. No. 39).

A.    **Standing on her Own Behalf**

PNY argues that Geske lacks standing to seek damages on her own behalf because she did not allege an injury in fact. *See* Def. Mtn. to Dismiss, at 7–11 (Dckt. No. 43). An injury in fact is the "[f]irst and foremost" of standing's three requirements. *See Spokeo*, 136 S. Ct. at 1547 (quoting *Steel Co.*, 523 U.S. at 103). Under *Lujan*, an injury in fact means a harm that is

"concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Friends of the Earth*, 528 U.S. at 180–81 (citing *Lujan*, 504 U.S. at 560).

PNY argues that Geske's alleged injury is neither "concrete" nor "particularized." *Id.* An injury is concrete if it is "de facto," that is, "'real,' and not 'abstract.'" *Spokeo*, 136 S. Ct. at 1548. That is, the injury must "actually exist." *Id.* An injury is "particularized" when it "affect[s] the plaintiff in a personal and individual way." *Id.* That is, standing requires that the plaintiff has "*personally* suffered some real or threatened injury." *Gibson v. Quaker Oats Co.*, 2017 WL 3508724, at *2 (N.D. Ill. 2017) (emphasis in original); *see also Lujan*, 504 U.S. at 560 n.1.

First, PNY claims that Geske merely alleges disappointment with the product's performance, and disappointment is too abstract to be a concrete injury. *See* Def.'s Mtn. to Dismiss, at 8 (Dckt. No. 43). PNY's argument ignores what the complaint actually says. Geske alleges that she suffered an economic injury by overpaying for a product that underdelivers. *See* Am. Cplt., at ¶¶ 13, 48, 51, 79.

Geske alleges that she didn't get what she paid for. That's an injury. The Supreme Court has recognized that economic injuries may support standing. *See Sierra Club v. Morton*, 405 U.S. 727, 733 (1972) ("[P]alpable economic injuries have long been recognized as sufficient to lay the basis for standing."). "The injury-in-fact necessary to support standing may be an economic injury." 15 James Wm. Moore *et al.*, *Moore's Federal Practice* § 101.40[5][c] (3d ed. 2019). "Under the benefit-of-the-bargain theory, the economic injury is calculated as the difference in value between what was bargained for and what was received." *Id.*

The Seventh Circuit has recognized that financial injuries give rise to standing. In *In re Aqua Dots Products Liability Litigation*, 654 F.3d 748 (7th Cir. 2011), the plaintiffs represented

a class of consumers who had purchased a toy called Aqua Dots. The toy, made up of small beads that looked like candy, could cause serious physical damage to children who ate the beads. *Id.* at 750. The company issued a recall and provided refunds. *Id.* The *Aqua Dots* plaintiffs were purchasers who did not ask for a refund and whose children were not harmed. *Id.* The toy manufacturer argued that the plaintiffs lacked standing because the children did not swallow the beads and thus suffered no harm. *Id.* at 750–51.

The financial harm from buying a defective product gave rise to standing. "[P]laintiffs' loss is financial: they paid more for the toys than they would have, had they known of the risks the beads posed to children. A financial injury creates standing." *Id.* at 751; *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014) ("A consumer who is hoodwinked into purchasing a disappointing product may well have an injury-in-fact cognizable under Article III.").

Geske's allegation of an economic injury is sufficient to support standing. She alleges that she purchased a power bank that underdelivered. She overpaid for an unpowerful power pack. *See* Am. Cplt., at ¶¶ 11, 51, 74–75, 88. That is enough to establish a concrete injury. *See, e.g.*, *Remijas*, 794 F.3d at 694–95 ("[W]e have held that financial injury in the form of an overcharge can support Article III standing."); *In re Testosterone Replacement Therapy Prods. Liab. Litig.*, 159 F. Supp. 3d 898, 909 (N.D. Ill. 2016) ("Plaintiff has alleged that it paid for TRT drugs that it would not have paid for absent defendants' fraudulent marketing; this economic loss constitutes a concrete injury in fact."); *Muir v. Playtex Prods., LLC*, 983 F. Supp. 2d 980, 986 (N.D. Ill. 2013) ("Muir alleges that Playtex's product was worth less than what he paid because the product was not, in fact, better than its competitors at odor control. That is sufficient to establish standing under *Aqua Dots*.").

11

In its reply, PNY doubles down on its argument that Geske has not alleged a real economic injury. *See* Def.'s Reply, at 4–8 (Dckt. No. 45). The company argues that Geske has improperly conflated the concept of injury with the issue of deception. *Id.* at 5. But PNY cites cases that address the sufficiency of pleadings under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), not under Article III. *See* Def.'s Reply, at 4–8. And, in the only case that PNY cites that *does* address Article III standing, the court found that the plaintiffs had standing to pursue their claims. *See Haywood v. Massage Envy Franchising, LLC*, 2017 WL 2546568, at *5 (S.D. Ill. 2017) ("Plaintiffs state that MEF's deceptive acts caused their injuries of receiving a shorter massage than advertised, which satisfies Article III standing.").

Second, PNY contends that Geske has not suffered a "particularized" injury because she hasn't alleged that the power bank that she actually purchased was defective. *See* Def.'s Mtn. to Dismiss, at 8–9 (Dckt. No. 43). According to PNY, Geske only alleges that two other power banks she didn't purchase – the ones tested by the lab – were defective. *Id.* Therefore, she didn't personally suffer the injury at the center of her complaint.

Once again, PNY closes its eyes to what the complaint actually says. Geske claims that she bought a PowerPack 5200, believing that it would provide a certain amount of charging power. *See* Am. Cplt., at ¶¶ 46–47 (Dckt. No. 39). But when she used it, she found that the PowerPack 5200 needed to be charged more frequently than she expected. *Id.* at ¶ 48.

The complaint does not merely allege that PNY power banks *in general* are deficient. Instead, Geske alleges that her own power bank was too weak. She bought a product that "did not work as represented and warranted." *Id.* at ¶ 13. The complaint expressly cites her own "experiences." *Id.* at ¶ 49. She purchased product that did not live up to its billing. *Id.* at ¶¶ 45–49, 86–87.

PNY then points to the fact that Geske hired a lab to conduct tests on other PNY products. PNY seems to think that this case rests on testing in a lab (only), not real-world life experience by the putative class representative.

PNY relies heavily on a case from outside this district to support its motion to dismiss. *See* Def.'s Mtn. to Dismiss, at 9–10 (Dckt. No. 43). In *Gaminde v. Lan Pharma Nutrition, Inc.*, a consumer bought a 300 mg bottle of krill oil from CVS. *See Gaminde*, 2019 WL 1338724, at *1 (N.D.N.Y. 2019). Gaminde sued the krill oil manufacturer, alleging that, despite the 300 mg label, the bottle actually contained far less krill oil. *Id.* He based his allegations on a study by the U.S. Department of Agriculture which found that, after testing two bottles of CVS Krill Oil, the bottles contained only 60 percent of the promised 300 mg. *Id.* at *2. In concluding that Gaminde lacked standing to sue, the Northern District of New York emphasized that "it is speculation to allege that because two CVS Krill Oil bottles in a USDA study were found to have less than the stated amount of Omega-3 Krill Oil, the bottle that Gaminde purchased must as well." *Id.*

That case is not similar to this one. Gaminde relied on the USDA study – not his personal experience – when bringing the claim. The notion was that if the study found a problem, then the bottles at home must be problematic too. But Geske relies on her own personal experience, not merely an extrapolation from testing data. Geske alleges both that her power bank didn't work properly *and* that testing shows the problem persists in other PNY products. Geske did more than "allege that a product line contains a defect . . . rather, [she] alleged that [her] product actually exhibited the alleged defect." *See In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 616 (8th Cir. 2011) (internal quotations omitted). That is a particularized injury.

### B. Standing as a Class Representative

PNY also raises two challenges to Geske's ability to sue on behalf of a class composed of purchasers of all power banks that PNY markets and sells. *See* Def.'s Mtn. to Dismiss, at 11–12 (Dckt. No. 43).

First, PNY argues that Geske does not have standing to sue on behalf of any class because she herself lacks standing. *See* Def.'s Mtn. to Dismiss, at 11 (Dckt. No. 43). But she has standing, so that argument packs no punch.

Second, PNY argues that, even if Geske has standing to sue, her standing as class representative is limited to representing the class of persons who sustained an identical injury. *Id.* Specifically, the company argues that she can bring a claim (if at all) only on behalf of consumers who purchased the PowerPack 5200, not a class of consumers who purchased other power banks sold by PNY. *Id.*

As PNY points out, courts in this district – and around the country – are split on whether class representatives have standing to make claims about products that they did not personally purchase. *See id.* at 12 n.6; *Kubilius v. Barilla America, Inc.*, 2019 WL 2861886, at *3 (N.D. Ill. 2019). There is widespread agreement that a class representative lacks standing to represent class members who sustained injuries that are fundamentally different than the injuries suffered by the proposed class representative. But there is disagreement about whether consumers who purchase two different products necessarily sustain fundamentally different injuries.

A small number of courts apply a strict rule: a class representative who purchased product X lacks standing to represent a class member who purchased product Y, because their injuries are necessarily different in kind. *See Pearson v. Target Corp.*, 2012 WL 7761986, at *1 (N.D. Ill. 2012) ("[H]ow could [a class representative] possibly have been injured by representations made on a product he did not buy?").

14

But a growing majority of courts apply a different standard: a class representative who purchased product X has standing to represent a class member who purchased product Y if the injuries are "substantially similar." *See Ulrich v. Probalance, Inc.*, 2017 WL 3581183, at *6 (N.D. Ill. 2017); *see also Kubilius*, 2019 WL 2861886, at *3 (collecting cases); *Smith-Brown v. Ulta Beauty, Inc.*, 2019 WL 932022, at *5 (N.D. Ill. 2019); *Carrol v. S.C. Johnsons & Son, Inc.*, 2018 WL 1695421, at *4 (N.D. Ill. 2018); *Wagner v. Gen. Nutrition Corp.*, 2017 WL 3070722, at *5 (N.D. Ill. 2017); *see also* 1 *McLaughlin on Class Actions* § 4:28 (13th ed. 2016) ("A substantial number of courts have decided that a plaintiff may have standing to assert claims on behalf of class members based on products he or she did not purchase as long as the products and alleged misrepresentations about a purchased product are substantially similar. In those cases, the substantial similarity determination is a context-specific analysis, but frequently entails reference to whether the challenged products are of the same kind, whether they are composed of largely the same ingredients, and whether each of the challenged products bears the same alleged mislabeling.").

Allowing a named plaintiff to bring claims on behalf of others with substantially similar injuries allows courts to bundle cases about the same basic practice. *See, e.g., Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 541 (S.D.N.Y. 2013) (collecting cases). And later, when considering a motion for class certification, courts can weed out claims if the class representative is not sufficiently similar to members of the putative class. *Id.*

This Court joins the majority and holds that a plaintiff has standing to sue on behalf of purchasers who sustained a substantially similar injury. Whether Geske is an adequate class representative and can satisfy Rule 23 is another matter. For now, the question is merely

standing. She has standing to sue on behalf of others who suffered a substantially similar harm from similar products with similar misrepresentations. *See Ulrich*, 2017 WL 3581183, at *6.

More specifically, Geske has standing to sue on behalf of a class of consumers who purchased PNY power banks that involve the same type of alleged misrepresentations. First, as the complaint alleges, PNY's power banks operate in the same manner. They consist of an internal battery cell and a circuit board that converts the internal battery's charge into power conveyed to another electronic device. *See* Am. Cplt., at ¶¶ 34–36 (Dckt. No. 39). Geske alleges that PNY markets all of its products in the same way, by placing "prominent representations" about the power banks' mAh on the packaging, and using the mAh in the products' names. *Id.* at ¶¶ 30–32. Second, Geske's lab testing demonstrated that multiple power banks are unable to distribute the total capacity of the internal battery. The devices underperform when compared to the mAh stated on the packaging. *Id.* at ¶¶ 39, 41–44. According to Geske, consumers of all PNY power banks suffer the same injury. They purchased a product that provides less power than represented on the packaging. The only difference among PNY's power banks is the capacity of the internal battery cell (and presumably the price). *Id.* at ¶ 9. But the power banks consume about the same percentage of the total battery capacity (about a third of the power), regardless of the starting point.

Other courts in this district have found products to be substantially similar based on a comparable analysis. *See Kubilius v. Barilla America, Inc.*, 2019 WL 2861886, at *3 (N.D. Ill. 2019) (finding substantial similarity between two kinds of pasta sauce that contain preservatives despite a "no preservatives" label); *Carrol v. S.C. Johnsons & Son*, 2018 WL 1695421, at *4 (N.D. Ill. 2018) (finding lotion-based and spray-based sunscreen products with less SPF than advertised to be substantially similar); *Ulrich*, 2017 WL 3581183, at *6 (finding substantial

similarity because "all of the Products are protein supplements sold by Probalance," and the "alleged misrepresentations are the same, they all relate to the Products' quantity of protein"); *Wagner v. General Nutrition Corp.*, 2017 WL 3070772, at *5 (N.D. Ill. 2017) (finding substantial similarity among multiple dietary supplements that "have the same key ingredient" and "all of the Products contain misrepresentations for the same reason"); *Mednick v. Precor, Inc.*, 2014 WL 6474915, at *3 (N.D. Ill. 2014) (finding that all claims "rely on the same misrepresentation – that the Touch Sensors are accurate").

Geske has alleged that the internal battery cells "fill the same function [in] every machine, and they are used in the same manner [in] every machine. They also allegedly fail in the same manner [in] every machine." *See Mednick*, 2014 WL 6474915, at *3. The similarity gives her standing to pursue claims on behalf of a class of purchasers of similar PNY products who suffered a substantially similar injury from similar misrepresentations.

## C. Injunctive Relief

Finally, PNY argues that Geske lacks standing to seek injunctive relief. *See* Def.'s Mtn. to Dismiss, at 13 (Dckt. No. 43). The gist of the argument is that there is no risk of future harm and thus no need for an injunction.

Again, a plaintiff bears the burden of demonstrating standing to seek each form of relief. *See Friends of the Earth*, 528 U.S. at 185 ("[A] plaintiff must demonstrate standing separately for each form of relief sought."); *Simic*, 851 F.3d at 738. The fact that Geske has standing to seek damages does not mean that she has standing to seek an injunction. *See Lyons*, 461 U.S. at 109; *Kenseth v. Dean Health Plan*, 722 F.3d 869, 890 (7th Cir. 2013) ("[A] plaintiff must demonstrate standing for each form of relief sought. A plaintiff may have standing to pursue damages but not injunctive relief, for example, depending on the circumstances.").

17

PNY argues that Geske has not demonstrated that a future injury in fact is likely. *See* Def.'s Mtn. to Dismiss, at 13 (Dckt. No. 43); *Lujan*, 504 U.S. at 560. "Unlike with damages, a past injury alone is insufficient to establish standing for purposes of prospective injunctive relief. 'Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'" *Simic*, 851 F.3d at 738 (quoting *Lyons*, 461 U.S. at 95–96).

To establish injury in fact when seeking prospective injunctive relief, "a plaintiff must allege a 'real and immediate' threat of future violations of their rights." *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1074 (7th Cir. 2013) (citing *Lyons*, 461 U.S. at 102); *see also* 15 James Wm. Moore *et al.*, *Moore's Federal Practice* § 101.61[6][b] (3d ed. 2019). PNY argues that Geske's complaint fails that test because she has not alleged that she or the members of the class will be harmed in the future. *See* Def.'s Mtn. to Dismiss, at 13 (Dckt. No. 43).

There is a "split of authority on the question of whether consumer plaintiffs claiming [only that] they were deceived can pursue injunctive relief when they are aware of the deceptive practice at issue." *See In re Herbal Supplements Mktg. and Sales Practices Litig.*, 2017 WL 2215025, at *7 (N.D. Ill. 2017) (collecting cases).

Most courts in this district have held that a plaintiff who alleges only past deception cannot pursue injunctive relief because they have not alleged a "'real and immediate threat' of *future violations* of their rights." *Scherr v. Marriott Int'l*, 703 F.3d 1069, 1074 (7th Cir. 2013) (citing *Lyons*, 461 U.S. at 102) (emphasis added); *see also Benson v. Fannie May Confections Brands, Inc.*, 2018 WL 1087639, at *5 (N.D. Ill. 2018) ("Most courts to address similar circumstances have held that absent some concrete basis to conclude that the plaintiffs will or must purchase the product again in the future and be deceived, they cannot meet the standing

18

requirements for injunctive relief claims."); 1 *McLaughlin on Class Actions* § 4.28 (13th ed. 2016) ("Though a minority view disagrees, most courts to address the question have ruled that a plaintiff who is a former customer who provides no concrete basis to conclude that he or she will purchase the product at issue in the future (so that they be subject to the challenged practice) lacks standing to pursue injunctive relief on behalf of a consumer class because the plaintiff is unlikely to suffer future harm.").

Once a plaintiff knows that a product is deficient, he or she is unlikely to purchase it again, and therefore unlikely to sustain future harm. A "fool me once" plaintiff does not need an injunction if he or she is not going to buy the product again anyway. There is no risk of "fool me twice," so there is no basis for an injunction.

For example, in *Mednick v. Precor*, plaintiffs purchased exercise equipment with a touch sensor monitoring feature, only to find that the feature didn't work as advertised. *See Mednick*, 2016 WL 5390955, at *8 (N.D. Ill. 2016). One plaintiff alleged that he "would not have purchased the treadmill had he known the Touch Sensor Monitoring feature . . . was actually unreliable and inaccurate." *Id.* The court determined that it seemed "clear from the allegations in the complaint that Plaintiffs [had] no plans to purchase the *same product* as to which [they] [sought] prospective relief." *Id.* (internal quotation marks omitted.). The court concluded that, without an allegation of risk of future harm, there was no injury in fact to support standing for injunctive relief. *Id.* at *9.

Although the Seventh Circuit hasn't directly addressed standing for injunctive relief in this context, it has offered instructive dicta.[2] *See Camasta v. Jos. A. Bank Clothiers, Inc.*, 761

---

[2] The court in *In re Herbal Supplements Marketing and Sales Practices Litigation*, 2017 WL 2215025 (N.D. Ill. 2017) noted that *Camasta*'s reasoning is grounded in Article III jurisprudence. "*Camasta* uses the language of Article III standing (*i.e.*, 'case or controversy'), cites *O'Shea* [*v. Littleton*, 414 U.S. 488 (1974)] (an Article III standing case), and '[f]ederal courts must determine that they have jurisdiction

F.3d 732 (7th Cir. 2014). There, the Court of Appeals stated that, once a plaintiff is aware of a defendant's "sale practices, he is not likely to be harmed by the practices in the future." *Id.* at 741. Courts in this district have picked up that line of reasoning and concluded that allegations of deceptive practices, without more, do not support standing for injunctive relief.

"Most courts to address similar circumstances have held that absent some concrete basis to conclude that the plaintiffs will or must purchase the product again in the future and be deceived, they cannot meet the standing requirements for injunctive relief claims." *Benson v. Fannie May Confections Brands, Inc.*, 2018 WL 1087639, at *5 (N.D. Ill. 2018); *see also Ulrich*, 2017 WL 3581183, at *7 ("If plaintiff is aware of Probalance's allegedly deceptive practice, then he faces no real and immediate threat that Probalance's misleading labels will deceive him again in the future.") (internal quotations omitted); *In re Herbal Supplements Mktg. and Sales Practices Litig.*, 2017 WL 2215025, at *8 ("Plaintiffs make clear in their complaint that they would not have purchased the Affected Products had they known the truth about them. . . . Plaintiffs cannot pursue injunctive relief because they face no real immediate threat of future injury."); *Bohn*, 2013 WL 3975126, at *3 (finding no standing for injunctive relief when plaintiff alleged that she "had she known the truth," she "*would not have purchased Defendants' Product.*") (emphasis in original) (cleaned up). "As many courts have explained, because a plaintiff in a false advertising case has *necessarily* become aware of the alleged misrepresentations, 'there is no danger that they will again be deceived by them.'" *See Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 465 (S.D.N.Y. 2020) (emphasis in original).

---

before proceeding to the merits.'" *Id.* at *8 (quoting *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam)). "Thus, *Camasta* dealt with Article III standing. Even if *Camasta* were dicta . . . it is persuasive." *Id.*

Geske points to a case from this district to argue that it creates a "public policy conundrum" if plaintiff cannot seek an injunction based on a past deception. *See* Pls.' Resp. to Def.'s Mtn. to Dismiss, at 13 (Dckt. No. 44); *Leiner v. Johnson & Johnson Consumer Companies, Inc.,* 215 F. Supp. 3d 670 (N.D. Ill. 2016). She rests her argument on the following line from the *Leiner* opinion: "the injunctive provisions of consumer protection statutes such as ICFA could never be invoked to enjoin deceptive practices if the complaining consumer's standing dissipated the moment she discovered the alleged deception and could no longer be fooled." *Leiner*, 215 F. Supp. 3d at 673.

Plaintiff's argument fails for three reasons. First, "public policy concerns do not confer Article III standing on a plaintiff who fails to allege an individual injury in fact." *Id.* Second, public agencies like the Federal Trade Commission could fill the void. Third, requiring a likelihood of future deception does not render meaningless the injunctive portions of the consumer protection statutes. It simply requires them to plead a cognizable future harm.

Geske does not have standing to request an injunction. Geske hasn't alleged that she – or potential class members – likely will suffer future harm from PNY's deceptive labels. Geske alleges a past harm: overpaying for a product that didn't meet her expectations. *See* Am. Cplt., at ¶¶ 13, 48, 51, 79. But she does not allege that she or any of the class members are likely to purchase the product again. *Id.* at ¶ 88; *see also id.* at ¶¶ 73, 74.

The threat of future injury must be imminent, not conjectural. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *Lyons*, 461 U.S. at 111 (holding that a plaintiff must show a "sufficient likelihood that he will again be wronged in a similar way"); *ACLU v. Clapper*, 785 F.3d 787, 800 (2d Cir. 2015) ("The Supreme Court has repeatedly reiterated that the threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible

21

future injury are not sufficient.").  Raw "allegations of possible future injury" are not enough.
*See Hesse*, 463 F. Supp. 3d at 465 (quoting *Clapper*, 785 F.3d at 800).

Here, Geske doesn't even do that.  There is nothing in the complaint about a possible
future purchase.  A conclusory allegation wouldn't cut it, but here, Geske doesn't even make a
conclusory allegation.  There is nothing about a possible future harm.

Plaintiffs like Geske who allege that they were deceived in the past – but have not alleged
any likelihood of being deceived in the future – do not have standing to seek an injunction under
Article III.  No risk of future harm means no basis for an injunction.  In sum, Geske has not
alleged a risk of future harm sufficient to support standing to seek an injunction, and therefore
may not seek prospective injunctive relief against PNY.

## II.    Failure to State a Claim

PNY also moves to dismiss each count for failure to state a claim.  *See* Fed. R. Civ. P.
12(b)(6).  PNY challenges the demand for punitive damages, too.

### A.    Illinois Consumer Fraud and Deceptive Business Practices Act Claim

First, PNY asserts that Geske fails to state a claim under the Illinois Consumer Fraud and
Deceptive Business Practices Act (the "ICFA"), 815 ILCS 505/2.

The ICFA is a "regulatory and remedial statute intended to protect consumers . . . against
fraud, unfair methods of competition, and other unfair and deceptive business practices."
*Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 416–17, 266 Ill. Dec. 879, 755 N.E.2d
951 (2002).  The ICFA prohibits "unfair or deceptive acts or practices, including but not limited
to the use or employment of any deception, fraud, false pretense, false promise,
misrepresentation or the concealment, suppression or omission of any material fact, with intent
that others rely upon the concealment, suppression or omission of such material fact . . . in the

22

conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

A claim under the ICFA requires a plaintiff to prove "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception." *Skyrise Construction Group, LLC v. Annex Construction, LLC*, 956 F.3d 950, 960 (7th Cir. 2020) (quoting *De Bouse v. Bayer*, 235 Ill.2d 544, 337 Ill. Dec. 186, 922 N.E.2d 309, 313 (2009)) (internal quotation marks omitted); *see also Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019) ("To recover on a claim under the Act, a plaintiff must plead and prove that the defendant committed a deceptive or unfair act with the intent that others rely on the deception, that the act occurred in the course of trade or commerce, and that it caused actual damages.").

PNY argues that Geske's complaint fails to allege a deceptive act, intent, or damages. *See* Def.'s Mtn. to Dismiss, at 14–23 (Dckt. No. 43). PNY also contends that the complaint fails to satisfy the heightened pleading standard under Rule 9(b) for claims sounding in fraud. *See Vanzant*, 934 F.3d at 738 ("If the claim rests on allegations of deceptive conduct, then Rule 9(b) applies and the plaintiff must plead with particularity the circumstances constituting fraud."); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 446 (7th Cir. 2011). Rule 9(b) applies to claims under the ICFA when the plaintiff alleges deceptive conduct. *See Camasta v. Jos. A. Banks Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014); *O'Connor v. Ford Motor Co.*, 2020 WL 4569699, at *7 (N.D. Ill. 2020).

"Rule 9(b) requires that [Plaintiff's] complaint 'state the identity of the person making the representation, the time, place, and content of the misrepresentation, and the method by

23

which the misrepresentation was communicated to the plaintiff.'" *Greifenstein v. Estee Lauder Corp.*, 2013 WL 3874073, at \*2 (N.D. Ill. 2013) (quoting *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992)). In other words, the complaint "must describe the 'who, what, when, where, and how' of the fraud.'" *Pirelli*, 631 F.3d at 441–42 (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009)).

### 1. Deceptive Act

PNY begins by arguing that Geske has not alleged a deceptive act. The complaint says otherwise.

"A practice is deceptive 'if it creates a likelihood of deception or has the capacity to deceive.'" *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) (quoting *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001)). To determine the likelihood of deception, courts apply a "reasonable consumer" standard. *Id.* "This requires more than a mere possibility that [a] label might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner. Rather, the reasonable consumer standard requires a probability that a significant portion of the general consuming public . . . acting reasonably in the circumstances, could be misled." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016); *Beardsall v. CVS Pharmacy, Inc.*, 2019 WL 1168103, at \*3 (N.D. Ill. 2019) (citing *Ebner*).

Context matters, too. "[W]hen analyzing a claim under the ICFA, the allegedly deceptive act must be looked upon in light of the totality of the information made available to the plaintiff." *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 884 (7th Cir. 2005).

PNY moves to dismiss by offering its own, competing interpretation of the meaning of its packaging. *See* Def.'s Mtn. to Dismiss, at 15–16 (Dckt. No. 43). The company argues that the labeling of the PowerPack 5200 never made a representation about the amount of power that the

product could *deliver* to another device. Instead, the 5200 mAh referred to the capacity of the battery. *Id.* PNY points to the picture of the bottom of the power bank, circling in red (in its brief) a key phrase: "Capacity: 5200mAh." *Id.* at 16.

As PNY sees it, there is no false or deceptive statement. Consumers get what PNY advertises: a power bank with an internal battery of a certain capacity, exactly what is represented on the packaging. *Id.*

PNY essentially asks for a declaration, as a matter of law, that Geske is an unreasonable consumer. In its view, any reasonable consumer would understand that the reference to mAh on the packaging referred to the capacity of the battery, not the power transferred to another device. *See* Def.'s Mtn. to Dismiss, at 16, 18–21 (Dckt. No. 43). PNY points to Department of Energy regulations that explain a battery's capacity is usually given in mAh.[3] *Id.* at 16. And, PNY says, reasonable consumers understand that "it takes energy to transfer energy." *Id.*

At best, PNY offers a different gloss on the meaning of its packaging. But at the motion to dismiss stage, the inferences flow in favor of the plaintiff. Geske offers a plausible reading of the packaging, and PNY offers another. That's not a reason to dismiss the claim. "Overall, 'the determination [] whether an ad has a tendency to deceive is an impressionistic one more closely akin to a finding of fact than a conclusion of law.'" *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 762 (7th Cir. 2014) (quoting *Kraft, Inc. v. Fed. Trade Comm'n*, 970 F.2d 311, 317 (7th Cir. 1992)).

In some cases, the allegation of a misrepresentation is outside the field of play, meaning that no reasonable consumer could have been deceived. In that case, a court can dismiss the

---

[3] PNY goes outside the pleadings on a motion to dismiss, which is reason enough to deny the motion (on this point, at least). Also, it seems like a safe bet that not a lot of consumers have read Department of Energy regulations about battery capacity.

claim on a motion to dismiss. *See, e.g.*, *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938–39 (7th Cir. 2001); *Fuchs v. Menard, Inc.*, 2017 WL 4339821, at *5 (N.D. Ill. 2017). In other cases, the packaging itself provides other information that dispels any inference of a false statement. There, too, a court can dismiss the claim because the context as a whole shows that there was no deception. *See In re 100% Grated Parmesan Cheese Mtg. and Sales Practices Litig.*, 275 F. Supp. 3d 910, 921–22 (N.D. Ill. 2017) ("[T]he 'context of the packaging as a whole' must be considered in evaluating whether deception has occurred.") (citation omitted).

That's not this case. PNY simply offers another way to read the packaging. But it's not the *only* way to read the packaging. The existence of a competing narrative, without more, is not enough to defeat a claim when plaintiff's theory of the case is plausible. It is.

PNY argues that its product packaging, taken as a whole, cures any confusion. *See Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 884 (7th Cir. 2005) ("[T]he allegedly deceptive act must be looked upon in light of the totality of the information made available to the plaintiff."); *In re 100% Grated Parmesan Cheese*, 275 F. Supp. 3d at 921–22 ("[T]he 'context of the packaging as a whole' must be considered in evaluating whether deception has occurred.") (citation omitted). Consumers "who interpret ambiguous statements in an unnatural or debatable manner do so unreasonably if an ingredient label would set them straight." *In re 100% Grated Parmesan Cheese*, 275 F. Supp. 3d at 922.

The company points out that its PowerPack 5200's packaging clarifies that the power bank offers "3x CHARGES*." *See* Am. Cplt., at ¶ 30 (Dckt. No. 39); Def.'s Ex. A., at 2 (Dckt. No. 43-2) (all caps in original). That explanation appears prominently, front and center, in all caps. *Id.* The side of the box clarifies that the power banks offers "UP TO 3x CHARGES*." *See* Def.'s Ex. A., at 4. That representation, though, comes with an asterisk. *See id.* at 2, 4.

26

Turning the power bank's box over to the back of the packaging reveals that the potential "3x CHARGES*" actually "varies by device."[4]  *Id.* at 3.

In *Parmesan*, the court found that a reasonable consumer looking at a cheese product's packaging as a whole could not believe that the product was 100 percent natural cheese.  *See In re 100% Grated Parmesan Cheese*, 275 F. Supp. 3d at 923.  The ingredient label explicitly identified non-cheese ingredients.  *Id.*  What's more, the cheese remained "shelf-stable at room temperature," which is unnatural for a dairy product.  *Id.*

PNY's packaging did provide a plain English explanation.  Any consumer surely can understand "3x CHARGES*."  *See* Am. Cplt., at ¶ 30 (Dckt. No. 39).  That phrase provided down-to-earth information.  A consumer would understand "3x CHARGES*," but presumably would not understand the relationship between the number of charges and the number of mAh.

Even so, the phrase "3x CHARGES*" does not fully explain the reference to the number of mAh.  Unlike an ingredient list on a package of cheese, there is no obvious connection between the number of charges and the amount of mAh.

If anything, there is a disconnect.  The phrase "3x CHARGES*" refers to what a consumer's electronic device will *receive*.  But PNY is arguing that 5200 mAh refers to the power bank's capacity, *not* what the electronic device will receive.  So "3x CHARGES*" provides a simple, user-friendly explanation of what the device can do, but it does not fully explain the reference to 5200 mAh.  One is about delivery, and the other is about capacity.

---

[4]  It is unclear whether Geske's power bank actually provided "3x CHARGES*," as the label seemed to promise.  If the device actually delivered three charges, but yet provided less than 5200 mAh, then it is possible that Geske might not have a claim.  The explanatory phrase "3x CHARGES*," unlike "5200 mAh," is something that every consumer can understand.  So, that phrase might provide critical context down the road.  But at this early stage, the facts are unknown, and the inference flow in Geske's favor.  So, the Court stops short of definitively ruling that the phrase "3x CHARGES*" does not negate the claim.

Common sense probably comes into play with unrefrigerated cheese more than the electrical capacity of charging devices. Consumers have intuitions about room temperature dairy products. They're less likely to have a gut feeling about what it means for a charging device to offer mAh. Unlike a package of cheese sitting out on a room-temperature shelf in a grocery store, a power bank lacks "commonsense, observable" facts that would allow a reasonable consumer to contextualize representations that a power bank offers 5200 mAh. *See Al Haj v. Pfizer Inc.*, 2019 WL 3202807, at *6 (N.D. Ill. 2019) (quoting *Al Haj v. Pfizer Inc.*, 338 F. Supp. 3d 741, 756 (N.D. Ill. 2018) ("It is reasonable to expect that a consumer would [examine the entire packaging], at least where something about the observable context of that product's retail presentation . . . should prompt suspicion that the product might not be 100% cheese or fresh-squeezed juice.")).

To survive a Rule 12(b)(6) motion, a plaintiff need only "nudge[] [her] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Plausibility remains the pleading benchmark, even when a claim is subject to Rule 9(b)'s particularity requirement." *Hobbs v. Gerber Prods. Co.*, 2018 WL 3861571, at *8 (N.D. Ill. 2018) (citing *United States ex. rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 778 (7th Cir. 2016)); *see also Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017) ("It is enough to plead a plausible claim, after which 'a plaintiff receives that benefit of imagination, so long as the hypotheses are consistent with the complaint.'") (quoting *Twombly*, 550 U.S. at 563). Drawing all inferences in Geske's favor, it is plausible that a reasonable consumer would understand that the mAh featured in a power bank's name and listed prominently on its packaging represented the amount of power that the power bank could transfer to another device.

The complaint also satisfies the particularity requirements of Rule 9(b). In February 2018, Geske purchased PNY's PowerPack 5200 in a Meijer store in Illinois. *See* Am. Cplt., at ¶ 45. She alleged that PNY made specific misrepresentations on the packaging of its power bank. *Id.* at ¶¶ 24–25, 30. Geske was exposed to the deceptive representation when she picked up the power bank and saw the product's name and total mAh in bold on the packaging. *Id.* at ¶¶ 24, 30, 45–46. She alleged the "who, what, when, where, and how" of the fraud. *See United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854–55 (7th Cir. 2009) ("It is enough to show, in detail, the nature of the charge, so that vague and unsubstantiated accusations of fraud do not lead to costly discovery and public obloquy."); *see also Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 739 (7th Cir. 2019); *Hobbs*, 2018 WL 3861571, at *6.

### 2. Intent

PNY also argues that Geske did not sufficiently allege intent to deceive. *See* Def.'s Mtn. to Dismiss, at 21–22 (Dckt. No. 43). The company demands "factual enhancement" to support Geske's claim that it "intentionally deceives consumers by misrepresenting the amount of power its Product can transfer to" other devices. *Id.* at 21 (quoting Am. Cplt., at ¶ 11).

Rule 9(b) does not require a complaint to allege intent with particularity, even in fraud claims. A plaintiff must allege "with particularity the *circumstances* constituting fraud." *See* Fed. R. Civ. P. 9(b) (emphasis added). But as the very next sentence of the Rule makes clear, "intent . . . may be alleged generally." *Id.*

The complaint adequately alleges an intent to deceive. PNY knows that its power banks are "technologically incapable of delivering the amount of mAh [included] in the product name, in advertising for the Product, and on the Products and their packaging." *Id.* at ¶¶ 33, 39. But PNY creates an impression about the amount of power that the power banks will deliver because it knows that consumers will pay more for more power. *Id.* at ¶¶ 7–8. PNY "intentionally

29

deceives consumers by misrepresenting the amount of power its Products can transfer," and does so for "profit and a higher market share." *Id.* at ¶ 11. "PNY is incentivized to mislead consumers to take away market share from competing products, thereby increasing its own sales and profits." *Id.* at ¶ 26.

Viewed as a whole, the allegations of the complaint are more than enough to put PNY on notice of a claim of deception. *See Ulrich*, 2017 WL 3581183, at *8 (collecting cases). After discovery, maybe Geske's claim won't pan out. Maybe there will be evidence that there is an applicable industry standard of some kind. Or maybe PNY will present other evidence that it had no intention to deceive anyone. But in the meantime, the pleading includes enough to survive.

### 3. Damages

PNY also challenges the sufficiency of Geske's damages allegations. To the extent that PNY incorporates its argument that Geske failed to allege an Article III injury in fact, the Court has already found that Geske alleged an injury that supports standing. *See* Def.'s Mtn. to Dismiss, at 22 (Dckt. No. 43).

As PNY sees it, alleging an injury in fact is not enough: "Plaintiff must show more than an Article III Injury." *See* Def.'s Mtn. to Dismiss, at 22 (Dckt. No. 43). "The actual damage element of a private ICFA action requires that the plaintiff suffer 'actual pecuniary loss.'" *Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010) (quoting *Mulligan v. QVC, Inc.*, 382 Ill. App. 3d 620, 628, 321 Ill. Dec. 257, 888 N.E.2d 1190 (2008)). When an individual consumer brings an ICFA claim, "actual loss may occur if the seller's deception deprives the plaintiff of 'the benefit of her bargain' by causing her to pay 'more than the actual value of the property.'" *Id.* (quoting *Mulligan*, 382 Ill. App. 3d at 628).

30

The company argues that Geske has not pled with particularity that she was deprived of the benefit of her bargain. *See* Def.'s Mtn. to Dismiss, at 22 (Dckt No. 43). Again, PNY closes its eyes to what the complaint actually says. Geske alleges quite plainly that she paid for a device that underperformed, and thus did not get what she paid for. *See* Am. Cplt., at ¶¶ 13, 48–49, 51, 60, 75, 86, 90. That allegation appears generously in the complaint, but PNY ignores it all.

And even then, Rule 9(b)'s particularity requirement does not apply to allegations about damages. "By its terms, Rule 9(b)'s particularity requirement applies only to allegations of fraud." *Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 783 (7th Cir. 1999); *see also Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 446 (7th Cir. 2011) ("[T]he dictates of Rule 9(b) apply to allegations of fraud, not claims of fraud."). In reading the plain text of the Rules, other courts in this Circuit have concluded that while Rule 9(b)'s particularity requirement applies to the specific allegations of fraud, damages are subject to the notice pleading requirements of Rule 8. *See, e.g.*, *Hobbs*, 2018 WL 3861571, at *10 (collecting cases).

PNY analogizes Geske's damages to those found insufficient in *Camasta v. Jos. A. Bank Clothiers, Inc.*, 2013 WL 474509 (N.D. Ill. 2013), *aff'd* 761 F.3d 732 (7th Cir. 2014). That case involved a claim that a plaintiff would not have bought certain clothes from a retailer if he had known that the "advertised 'sale' price was the normal retail price." *Camasta*, 2013 WL 464509, at *1. The district court found that allegation insufficient to support actual damages under the ICFA. As the district court saw it – and the Seventh Circuit affirmed – the plaintiff got exactly what he bargained for: six shirts. The plaintiff did not "allege that he paid an unfair price or

more than the value of the shirts." *Id.* at \*4; *see also Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 740 (7th Cir. 2014).

 *Camasta* is not like this case. *Camasta* was a "deceptive price comparison case[], in which the court[] held that there was no 'actual pecuniary loss'" when plaintiffs failed to allege that their products were not "actually worth the price" they had paid. *See Hobbs*, 2018 WL 3861571, at \*9. Plaintiffs based their damages on defendants' misrepresentations of the "amount the buyers would *save* buying at putative sale prices rather than any claim that the products purchased were not worth the prices that consumers had paid." *Id.* (emphasis in original). *Camasta* found no actual damages where the plaintiff alleged inadequate savings but did not allege that his purchases were actually worth less than what he paid.

 Here, Geske alleges that she paid more than the value of her PowerPack 5200. *See* Am. Cplt., at ¶¶ 13, 27, 51, 73–74, 79 (Dckt. No. 39). Unlike Camasta, Geske did not get the benefit of her bargain. PNY misled Geske into believing that she was buying a power bank capable of transferring 5200 mAh. Instead, she bought a power bank that transferred something less.

 "When a plaintiff alleges that it purchased something because of a fraudulent misrepresentation, there is actual injury when the plaintiff suffers a pecuniary loss by receiving goods that are worth less than was promised." *Aliano v. Louisville Distilling Co., LLC*, 115 F. Supp. 3d 921, 931 (N.D. Ill. 2015). This case fits the mold. Geske alleges that she bought something that was less valuable than what she paid because she relied on a misrepresentation. "Geske and the other members of the Classes were damaged in the amount of the purchase price they paid for the Products, or the difference between the value of the Products if they had the actual warranted mAh." *See* Am. Cplt., at ¶ 86; *see also id.* at ¶¶ 27, 73–74; *id.* at ¶ 75 ("Geske and the other class members have overpaid for the Products . . . .").

Other courts in this district have found similar allegations enough to satisfy the ICFA's actual damages requirement. *See, e.g.*, *Hobbs*, 2018 WL 3861571, at *9 ("[T]he Court reads the complaint to claim that Hobbs did not receive the benefit of the bargain – that she did not receive what she thought she was paying for – and that suffices as a claim of actual pecuniary loss."); *Ulrich*, 2017 WL 3581183, at *9 ("It is sufficient to allege that [plaintiff] 'suffer[ed] a pecuniary loss by receiving goods that are worth less than was promised.'") (citation omitted); *Aliano*, 115 F. Supp. 3d at 931 ("[P]laintiffs adequately allege that the whiskey they received was worth less than what they were promised. Defendant contends that these allegations are too conclusory . . . . We disagree."); *Greifenstein v. Estee Lauder Corp., Inc.*, 2013 WL 3874073, at *7 (N.D. Ill. 2013) ("In light of the fact that Greifenstein alleges that the serum simply did not work for her at all, the allegation that she would not have bought the serum is enough to allege . . . actual damages."); *Muir v. Playtex Prods. LLC*, 983 F. Supp. 2d 980, 990 (N.D. Ill. 2013) ("Muir alleges that he was deprived of the benefit of the bargain because the Diaper Genie II Elite product was actually worth less than what it would have been worth had it actually been proven superior in odor control to its competitors. That is sufficient to plead actual damages under the ICFA.").

The Court denies PNY's motion to dismiss Geske's claim under the ICFA (Count I).

### B. Breach of Express Warranty and Unjust Enrichment Claims

PNY also moves to dismiss the breach of express warranty claim (Count II) and the unjust enrichment claim (Count III). PNY makes a bootstrap argument based on the ICFA claim. If the ICFA claim fails, then her other claims must fail, too. *See.* Def.'s Mtn. to Dismiss, at 23–24 (Dckt. No. 43).

That argument doesn't get PNY anywhere. The complaint states a claim under the ICFA. So a challenge to the breach of warranty claim and the unjust enrichment claim – based on the

premise that the ICFA claim fails – must fail too. The ICFA claim survives, so the other two counts do too. PNY advances no other argument.

### C. Punitive Damages

Finally, PNY challenges the request for punitive damages. "[I]t is undisputed that punitive damages are available for a violation of the Consumer Fraud Act." *Dubey v. Pub. Storage, Inc.*, 395 Ill. App. 3d 342, 356, 335 Ill. Dec. 181, 918 N.E.2d 265 (2009); *see also* 815 ILCS 505/10a(a); *BookXchange FL, LLC v. Book Runners, LLC*, 2019 WL 1863656, at *2 (N.D. Ill. 2019) ("Illinois law allows punitive damages for common law torts and for violations of the Consumer Fraud Act.") (citing cases).

The statutory text grants courts the power to award broad relief. "The court, in its discretion may award actual economic damages or any other relief which the court deems proper." *See* 815 ILCS 505/10a(a). "Any other relief" means *any* other relief. *Id.* The statutory text then includes a carve-out for punitive damages in certain types of cases. Courts cannot award punitive damages against a vehicle dealer or the holder of a retail installment contract. *Id.* The implication is that punitive damages are fair game in other types of cases.

Under Illinois law, punitive damages "may be awarded only if the defendant's tortious conduct evinces a high degree of moral culpability, that is, when the tort is committed with fraud, actual malice . . . or when the defendant acts willfully." *Saccameno v. U.S. Bank Nat'l Ass'n*, 943 F.3d 1071, 1082 (7th Cir. 2019) (quoting *Slovinski v. Elliot*, 237 Ill. 2d 51, 58, 340 Ill. Dec. 210, 927 N.E.2d 1221 (2010)) (cleaned up); *Frank P. v. New York Life Ins. Co.*, 2005 WL 8179400, at *9 (N.D. Ill. 2005). Whether a defendant's conduct merits punitive damages is usually a question for the trier of fact. *Slovinski*, 237 Ill. 2d at 58; *see also Wendorf*, 755 F. Supp. 2d at 981 ("Although judgment in favor of the defendant may be appropriate on the

34

summary judgment or judgment as a matter of law during trial, the court allows the plaintiffs to proceed to proof of defendant's conduct meriting such damages.").

PNY argues that Geske needed to allege that the company acted "maliciously or with deliberate indifference" to seek punitive damages. *See* Def.'s Mtn. to Dismiss, at 24 (Dckt. No. 43) (quoting *Wendorf v. Landers*, 755 F. Supp. 2d 972, 981 (N.D. Ill. 2010)).

Geske has alleged that PNY deceived customers about the amount of power provided by the power banks. The allegations sound in fraud, and a fraud claim can give rise to punitive damages. A motion to dismiss is not the right time to decide whether punitive damages are appropriate. It depends on the facts, and the Court does not weigh the facts on a motion to dismiss.

## Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendant PNY's Motion to Dismiss (Dckt. No. 42). The motion is granted as to Geske's demand for injunctive relief. The motion is otherwise denied.

Date: November 30, 2020

Steven C. Seeger
United States District Judge